**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Rudi Alfred Apelt,                    )
                                      )
              Petitioner,             )        CV-97-1249-PHX-ROS
                                      )
      v.                              )        **MEMORANDUM OF DECISION
                                      )        AND ORDER REGARDING
                                      )        CONVICTION-RELATED CLAIMS**
Dora Schriro, et al.,                 )
                                      )
              Respondents.            )
_____)

Rudi Alfred Apelt ("Petitioner") filed a Petition for Writ of Habeas Corpus alleging that he is imprisoned and sentenced to death in violation of the United States Constitution. (Dkt. 1.)[1] His Amended Petition raised twenty-three claims. (Dkt. 39.) In an Order dated April 11, 2000, the Court found that Claims 1, 2, 5 (in part), 6 (in part), 7 (in part), 8 (in part), 9 (in part), 10 (in part), 11, 12, 13 (in part), 15 (in part), 16 (in part), 17 (in part), 18, 19, 21, and 23 were procedurally barred; that Claims 16 and 17 (in part) were meritless; that Claims 10 (in part) and 20 were not cognizable on federal habeas review; and that Claim 22 was premature and not yet ripe for review. (Dkt. 71)  The Order further found that Claims 3, 4, 5 (in part), 6 (in part), 7 (in part), 8 (in part), 9 (in part), 13 (in part), 14, 15 (in part), and 17 (in part) were properly exhausted and would be addressed on the merits. (*Id.*)

On July 10, 2000, Petitioner filed his memorandum on the merits. (Dkt. 79)

---

[1]  "Dkt." refers to the documents in this Court's file. "ME" refers to the minute entries of the state court, "ROA" to the state court record on appeal (CR-91-0025-AP), and "RT" to the reporter's transcripts.

Respondents filed a response (Dkt. 84) and Petitioner filed a reply (Dkt. 97).

On June 28, 2002, Petitioner filed a motion to stay and hold these proceedings in abeyance pursuant to the United States Supreme Court's ruling in *Atkins*.[2] The Court granted the motion with respect to Petitioner's exhausted sentencing-related claims, denied with respect to the conviction-related claims, and ordered Petitioner to seek post-conviction relief on his *Atkins* claim in state court. (*See* Dkts. 147, 149, 151.)

This Order addresses Petitioner's properly exhausted conviction-related claims. As set forth below, the Court concludes that Petitioner is not entitled to habeas relief on any of these claims.

**BACKGROUND**

In August 1988, Petitioner and his younger brother Michael, accompanied by Petitioner's wife and Anke Dorn, Michael Apelt's girlfriend, traveled from their native Germany to America. In California and then in Arizona the brothers and Dorn embarked on a series of romantic and financial cons that culminated in the murder of Cindy Monkman. The following factual summary of Petitioner's crimes is derived, except where otherwise noted, from the Arizona Supreme Court's ruling in the companion case of *State v. Apelt (Michael)*, 176 Ariz. 349, 861 P.2d 634 (1993).[3]

In San Diego, California, the Apelt brothers met two women in a nightclub. Cheryl Rubenstein and Trudy Waters lived in Phoenix and were in San Diego to cater a party over the Labor Day weekend. They spent the evening talking with the Apelts, who first claimed to be

---

[2]  In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held that the Eighth Amendment prohibits a state from sentencing to death or executing a mentally retarded person.

[3]  Throughout his conviction and sentencing claims Petitioner emphasizes his alleged mental and emotional limitations. Petitioner asserts that because he is mentally retarded, brain-damaged, "dependent," and a "follower" (Dkt. 79 at 37-38), his involvement in the events leading to Cindy Monkman's death was passive and the product of his brother's influence. Petitioner further asserts that his mental and emotional limitations exacerbated the unfairness of the proceedings following his arrest and during his trial. (*See id.* at 65.) Given these assertions, this Order recounts in some detail the fact elicited at Petitioner's trial.

wind surfing board manufacturers, then Mercedes importers.  Petitioner denied being married.  The women gave the Apelts their addresses and phone numbers.

Approximately two weeks later, the brothers flew to Phoenix.  Ms. Rubenstein picked them up at the airport and took them to a hotel in Mesa.  The Apelts soon moved to a Motel 6, but pretended to be staying at the Holiday Inn, a more expensive hotel nearby.  After a couple of weeks, they flew back to San Diego, picked up Anke Dorn, and returned to Phoenix.  Petitioner's wife returned to Germany.

Although he claimed to be wealthy, Petitioner told Ms. Rubenstein that he needed money to get his Mercedes out of customs, where it had been impounded when the Apelts entered California form Mexico.  She gave him $400 in cash.  (RT 8/17/90 at 28.)  He said he would pay her back with funds he would soon be receiving from Germany.  (*Id.* at 29-30.)  Petitioner continued to ask Ms. Rubenstein for money, and in the end she gave him a total of $2,200.  (*Id.* at 33-34.)

In Phoenix, the brothers showed Ms. Rubenstein the building that supposedly housed their business, the Tannert Corporation.  (*Id.* at 35.)  They also showed her a $400,000 house they had contracted to buy in Ahwatukee.  (*Id.* at 46-47.)  Petitioner explained that the home was for Ms. Rubenstein and her family.  (*Id.* at 47.)

On October 4, 1988, Petitioner and Ms. Rubenstein had an appointment at his bank.  (*Id.* at 37.)  Ms. Rubenstein, who brought her young children along, went to pick up Petitioner at the Holiday Inn.  (*Id.*)  Before proceeding to the bank, Petitioner wanted to go inside the hotel and have a Coke.  (*Id.*)  While they were having their drinks, a woman purporting to be Petitioner's secretary from San Diego approached them and handed Petitioner a telegram.  (*Id.* at 38-39.)  The secretary appeared distraught.  Petitioner began to yell and cry, and tears rolled down his cheeks. (*Id.* at 38-40.)  The telegram was from Petitioner's stepmother.  (*Id.* at 39-40.)  It stated that Michael had been killed in an automobile accident and that Petitioner must now take over the brothers' business empire.  (*Id.*)  The appointment at the bank was forgotten.  Instead, following Petitioner's wishes, Ms. Rubenstein drove him to the Superstition Mountains where he could be alone with his grief.  (*Id.* at 40-41.)  On the way back to Mesa, Petitioner and Ms.

Rubenstein discussed Michael's funeral arrangements. (*Id.*) The services would take place in Florida, Petitioner told her. (*Id.* at 41-42.) He wanted Ms. Rubenstein and her husband to attend, and told her they could fly to Florida in his private jet. (*Id.*)

Ms. Rubenstein did not attend the funeral in Florida. (*Id.* at 42-43.) When Petitioner purportedly returned from the funeral, he contacted Ms. Rubenstein and offered her Michael's old position in the business, where she would have a secretary and engage in business deals. (*Id.* at 44-45.) They discussed stocks and bonds and international transfers of funds. (*Id.* at 45.) She agreed to accept the position. (*Id.* at 44.)

Petitioner indicated that he would buy her a new car for business purposes. (*Id.* at 48.) One day, after the spark plug wires in Ms. Rubenstein's vehicle were mysteriously pulled off and she was unable to get the car to run properly, Petitioner took her to a Dodge dealership. (*Id.* at 48-49.) He picked out a new $20,000 vehicle, had the salesman draw up a contract, and signed the document. (*Id.* at 49.) Petitioner indicated that he was going to pay cash for the car; he did not have any money at the time, however, so Ms. Rubenstein wrote a $1,000 check to hold the vehicle. (*Id.* at 50.) Petitioner explained that they would pick up the vehicle later and then meet with his family and lawyers to draw up the contracts for her new position with his company. (*Id.* at 51.)

Most of what Petitioner told Ms. Rubenstein was false. The Apelts were not wealthy; Michael Apelt was not dead; Petitioner's secretary was played by Anke Dorn, and the phony telegram was composed by Petitioner.[4] (RT 8/22/90 at 45.)

The brothers pursued other women, with varying degrees of success.[5] These activities

---

[4] During this time, the brothers employed the same ruse, with Rudi as the deceased and the telegram sent to Kealinda Amara, a woman Michael was attempting to marry. (RT 8/17/90 at 175-77.)

[5] For example, in October Petitioner directed his attention to a woman named Jane Keinz whom met he at a bar while she was attending a party with co-workers. (RT 8/24/90 at 55-56.) Petitioner smiled at her and asked her to dance. (*Id.* at 56-57.) He also obtained her business card from somebody in her group and subsequently began calling her at work. (*Id.* at 57.) Eventually, Ms. Keinz agreed to meet Petitioner again, primarily in order to convince him to

ceased, however, when Michael Apelt married Cindy Monkman.

On October 6, the Apelts met Annette Clay at Bobby McGee's, a bar and restaurant in Mesa. Petitioner claimed to be an international banker. Annette gave him her phone number, and Petitioner called her on Saturday. She met the Apelts at Bobby McGee's that evening, and introduced them to her friends, Cindy and Kathy Monkman. Michael immediately focused on Cindy and spent the evening dancing and talking with her. He told her repeatedly that he wanted to marry her. The brothers claimed to be computer and banking experts. At the end of the evening, Petitioner explained to the group that he needed to fly back to San Diego that night on business. (RT 8/16/90 at 139.)

During the next week, Annette and Cindy saw the Apelts several times. When Cindy noticed that after the Apelts visited her apartment she was missing over $100 in cash, she and Annette became suspicious. They questioned whether the Apelts were actually staying at the Holiday Inn and, by calling several hotels in the area, discovered that the Apelts were in fact registered at the Motel 6.

When confronted with this information, the Apelts insisted that there had been a mistake. That evening, after dropping the Apelts at the Holiday Inn, the women located their room at the Motel 6 and discovered Anke Dorn.

The next morning, Petitioner was furious and claimed that as a result of the women's snooping the brothers had lost their security clearance, jobs, and work visas, and had their bank accounts frozen. (*Id.* at 149-50.) He wept while recounting these misfortunes. (*Id.* at 151.) He then explained that Dorn was a family friend whose husband was in the hospital. The women were apologetic and suggested various ways they could help the brothers get their jobs back or find new jobs, but the Apelts refused these suggestions. Finally, in frustration, Annette exclaimed "what do you want us to do, marry you?" The Apelts replied, "yes."

---

stop phoning her at her workplace. (*Id.*) She brought her daughter with her, and was shocked to discover that Petitioner had somehow learned the girl's name. (*Id.* at 58.) Ms. Keinz explained to Petitioner that she was not interested in him. (*Id.*) When she left the establishment she noticed that money was missing from her purse. (*Id.* at 58-59.)

Petitioner moved into Annette's apartment and Michael moved into Cindy's.  Annette discussed with Petitioner the possibility of a sham marriage so that he could work in the United States, but Petitioner insisted that he loved her and that if they married he wanted it to be permanent. He also insisted that they keep the marriage secret.  Petitioner had been staying with Annette less than a week when Annette discovered that the story regarding Dorn was a lie. Annette asked Petitioner to leave and did not see him again.  Petitioner and Dorn then moved into a motel.  Thereafter, Michael told Annette several times that Petitioner had returned to Germany.  Cindy also believed that Petitioner and Dorn had left the country.

On October 28, 1988, Cindy and Michael were married in Las Vegas.  They did not tell anyone about the marriage.  On November 7, at Michael's suggestion, the couple consulted an insurance agent named Doug Ramsey about a million dollar life insurance policy.  Cindy believed Michael was wealthy and that purchasing large insurance policies was a customary investment practice for couples in Germany.  Ramsey informed them that they could not get such a large policy but that they might qualify for a $400,000 policy.  They filled out an application, and Cindy wrote a check for the first month's premium.

Around this time, and continuing up to the time of the murder, the Apelts and Dorn went on a series of shopping trips.  They looked at expensive Piaget and Rolex watches, at one time contracting to buy three for a total price of approximately $130,000.  The brothers looked at expensive boats and cars.  They test drove and arranged to buy two Jaguars for $144,000 (RT 8/17/90 at 86-87), made arrangements to purchase two Toyota Supras for about $66,000, and looked at two matching $100,000 Porsches (RT 8/21/90 at 123).  The brothers' pattern was to pose as international businessmen (RT 8/17/90 at 75) or the sons of an ambassador (*id.* at 84-85) or professional athletes (RT 8/21/90 at 74), fill out a purchase contract, make a nominal down-payment with assurances that they would pay cash upon receiving money from sources in Germany, and then never return.  They drove to the stores and car dealerships in Cindy's Volkswagen.  During some of these transactions, Petitioner appeared to take the lead or act as the decision-maker.  (RT 8/21/90 at 125; RT 8/22/90 at 12, 16-17.)

During one of the first shopping trips, Michael told Dorn that if Cindy died an unnatural

death, he would be rich.  By this time, the brothers had run out of money.  Michael paid most of Petitioner's and Dorn's expenses with Cindy's money, even though Cindy's income from her two part-time jobs was very modest.  On November 25, Ramsey informed Michael and Cindy that they could only get a $100,000 life insurance policy.  They executed a change form and, on November 30, applied for a $300,000 policy from another company.

Despite having exhausted their funds, in the days before Cindy was murdered, the Apelts purchased a $200 crossbow, which they took to the desert near Apache Junction for target practice.  (RT 8/22/90 at 65; RT 8/28/90 at 100.)  The brothers found that they could not shoot the weapon accurately.  (*Id.*)  They then purchased razor tips and a scope.  (RT 8/28/90 at 108.)

Early in December, Petitioner and Dorn reserved a rental car for December 9.  They specifically requested a vehicle with a large trunk.  Around this time, Ramsey informed Cindy that the second insurance company would not approve their application for a $300,000 policy until it had more background and financial information.  Cindy provided the information, and Ramsey resubmitted the application.  In the interim, Petitioner cancelled the car reservation.

On December 22, 1988, Ramsey informed Cindy and Michael that the $300,000 policy was approved and would be effective after Cindy gave him a check for the premium.  He also delivered the $100,000 policy.

On the morning of December 23, Cindy and Michael took her Volkswagen in for some repairs and rented a Subaru.  Cindy was busy getting ready to leave the next day for Illinois with her sister Kathy.  She made plans to meet her friend Annette for dinner at 8:00 p.m. to exchange gifts.  She also planned to bring along Maria, a young woman she had been counseling.

That same day Petitioner returned to the rental agency and rented the car with the large trunk that he had originally reserved for December 9.  Late in the afternoon, Michael returned to Petitioner's and Dorn's motel room.  Michael told them that they could have a "lot of money" if he killed Cindy.  They agreed to kill her that evening.  They made plans to meet in front of a German restaurant and proceed from there to the desert, where Cindy would be killed.  Michael stated that he would bring Cindy and make sure she could not see where they were going.

Cindy spoke with her father on the phone and then had a telephone conversation with

Maria from 6:50 p.m. to 7:00 p.m confirming that she and Michael would pick her up at 7:45 p.m. During the conversation, Maria heard Michael arriving in the background.

Petitioner and Dorn drove their rental car to the German restaurant at around 7:00 p.m. to wait for Michael. Michael drove by in the Subaru approximately fifteen minutes later. Dorn did not see Cindy in the car. Petitioner, driving his rental car and accompanied by Dorn, followed Michael toward a desert area where they had earlier practiced shooting the crossbow. Petitioner turned off the road when he reached this location, but Michael continued on. Petitioner drove around in the desert for a while before spotting Michael's car. He drove toward it, stopped some distance away, and got out of the car, ordering Dorn to remain in the vehicle and lie down. He returned after about five minutes and both he and Michael drove to the motel where Petitioner and Dorn were staying. The brothers showered and changed clothes.

The Apelts and Dorn met at Bobby McGee's at 10:30 p.m. and asked for a table for four. After waiting a while, ostensibly for Michael's wife, they went ahead and ordered dinner. (RT 8/17/90 at 143.) Michael and Petitioner discussed their alibi. They had several drinks after dinner and then went to another nightclub. Michael arrived home at around 2:00 a.m. on December 24 after dropping off Petitioner and Dorn at their motel. The next day, Petitioner exchanged his rental car, on the pretext that there was a problem with the steering. (RT 8/21/90 at 59-60.)

There were many calls on the answering machine from Annette, Kathy, and Maria, all of whom were worried because Cindy failed to show up for dinner or call Kathy as planned. Annette called again and spoke with Michael, who told her that Cindy had left the apartment at around 7:00 p.m. after receiving a phone call from an angry man. He claimed that she said she had to meet someone and would meet Michael at Bobby McGee's at 10:00 p.m. Annette came over to the apartment and called the police. She noticed that Cindy's purse was still in the apartment. An officer came and spoke with Michael and Annette. Michael repeated his story to the officer.

Cindy's body was found in the early afternoon of December 24. She had been stabbed once in the lower chest and four times in the back. Her throat had been slashed so deeply that

her head was nearly severed from her body.  There were numerous bruises on her face and body.  Police found a nylon cord and a blood-soaked beach towel near her.

There were many tire tracks in the area, although only two were clear enough to be of use.  These were consistent with the tires on the car driven by Petitioner.  There was also a fairly good shoe impression near the body and a partial shoe print on the victim's face as though the murderer had kicked or stepped on her head.  These were later found to be consistent with a particular style of Reebok tennis shoes.

Later that day officers interviewed Petitioner and Dorn, who repeated the previously agreed-upon story, claiming that they had seen Cindy leaving the apartment at 7:00 p.m. as they were arriving and that she promised to meet them later at Bobby McGee's.  When questioned, Michael denied owning tennis shoes.  When Cindy's body was identified that evening, officers first informed Petitioner.  He began crying, but eventually calmed down and agreed to break the news to his brother.  (RT 8/22/90 at 199.)

On the night of December 25, Petitioner and Dorn accompanied Michael as he drove the rented Subaru around the Salt River bottom.  He drove erratically, making hard turns and slamming on the brakes in an effort to change the tread of the tires so they could not be linked to the murder scene.  Two of the tires had to be replaced after the car was returned to the rental agency because they had flat spots caused by his driving.

Using the insurance policy as collateral, Michael borrowed some money and flew to Illinois with Petitioner and Dorn to attend Cindy's funeral on December 31.  Michael cried at the funeral and was unable to finish his eulogy.  (RT 8/16/90 at 112.)  Petitioner stepped in and completed the remarks.  (Id.)  Later, Kathy saw Michael and Petitioner grinning and appearing jovial as they drove away after the service.  That evening, while the Apelts and Dorn were at a disco, Michael told Dorn that Cindy had signed her own death warrant when she signed the insurance papers, but that he regretted killing her.  While the Apelts and Dorn were in Illinois, Cindy's father, a psychologist, observed that Petitioner appeared to be the decision-maker among the three.  (RT 8/23/90 at 106.)

The Apelts and Dorn returned to Phoenix on January 2.  The next morning they flew to

Los Angeles under assumed names.  Outside a restaurant, they approached a homeless black man and paid him $20 to read the following message over the phone and onto Cindy's answering machine:

> Hear what I have to talk.  I have cut through the throat of your wife and I stabbed and more frequently in the stomach in the back with a knife.  If I don't get my stuff, your girlfriend is next and then your brother and last it is you.  Do it now, if not, you see what happens.  My eyes are everywhere.

They then returned to Phoenix that afternoon.  Michael contacted Detective Ron Davis, a police officer who spoke fluent German, and asked him to translate the message.  Detective Davis listened to the message and instructed the Apelts to bring the tape to the police station the next day.

The police had discovered the insurance policy and identified Michael as a possible suspect in Cindy's murder.  The taped threat, which Detective Davis determined was a clumsy English translation of a text originally composed in German, confirmed their suspicions and, fearing that the Apelts and Dorn might leave the country, the police arranged to have a surveillance team watch them on the night of January 5.  Officers were deployed around the apartment complex.  Shortly after 8:30 p.m. one of the officers knocked on the Apelts' door to make sure they were home.  When Michael answered the door, the officer asked for a fictitious person and was told he had the wrong apartment.  Immediately after this, the Apelts called the police.  Petitioner reported that three tall, armed black men wearing expensive sunglasses had appeared at their door and threatened them, telling them to come to Los Angeles to straighten out a problem involving drugs.  Petitioner sounded scared and nervous when reporting the encounter.  (RT 8/22/90 at 217.)  The surveillance team was contacted and confirmed that this had not occurred.  Detective Davis told the Apelts and Dorn to come to the police station the next day to make composite sketches of their assailants.

Accordingly, on January 6, the Apelts and Dorn went to the police station.  The police spoke with the brothers separately and prepared artist's sketches based on their descriptions.  After waiting a couple of hours, the police began interrogating Dorn.  They urged her to tell the truth, told her she would be prosecuted, promised her immunity in exchange for her confession,

- 10 -

and showed her photographs of Cindy's body. Dorn confessed, and the Apelts were arrested. They were questioned again and this time each brother invoked his right to remain silent. (*See* RT 1/12/90 at 85, 159, 161.) Before invoking their *Miranda* rights, each brother denied ever having been to the Apache Junction area. (RT 8/23/90 at 13-14.)

On January 9, the police searched Cindy's apartment pursuant to a warrant. They seized a number of items, including the brothers' shoes, the crossbow, and business cards that led the police to some of the jewelry stores and car dealerships that the Apelts visited on their shopping trips. They also seized two rolls of film that contained pictures of Michael wearing tennis shoes with tread matching the footprint and impression left at the murder scene.

While the brothers were in jail, Dorn wrote to Petitioner several times. These letters, which contained various incriminating statements reflecting Dorn's version of the events surrounding the murder, were seized pursuant to two search warrants.

Michael sent Petitioner a note in German that, translated, stated in part:

> I have a guy who is getting out in two-four days and then we'll be free in one to two weeks. It won't matter if the police have anything or not. We're in jail and won't be able to have done that, so don't do anything, okay! Because when a woman is dead, the same thing will have happened, we'll be free and I'll have the money because the police won't be able to do anything.

The note was intercepted by a fellow inmate and turned over to the police. After the police interviewed this inmate, they obtained and executed a search warrant of Michael's, Petitioner's, and adjoining cells. Police seized other communications between the brothers, several of which were introduced at trial.

Petitioner was charged with one count of conspiracy to commit first-degree murder and one count of first-degree murder. (ROA 2). After a two-week trial, a jury found Petitioner guilty on both counts.[6] (ROA 341, 342). The court sentenced Petitioner to death on the murder count based on a finding of two aggravating factors – that Petitioner committed the offense in expectation of the receipt of something of pecuniary value, under A.R..S. § 13-703(F)(5), and

---

[6] The brothers were tried separately, with Petitioner's trial following Michael's. Dorn was granted immunity from prosecution in exchange for her testimony at both trials. Like Petitioner, Michael Apelt was convicted of both charges and sentenced to death for the murder.

1   in an especially heinous, cruel or depraved manner, A.R.S. § 13-703(F)(6) – and no mitigating

2   factors sufficient to call for leniency.  (ME 1/8/91.)  The Arizona Supreme Court affirmed

3   Petitioner's conviction and death sentence.  *State v. Apelt (Rudi)*, 176 Ariz. 369, 861 P.2d 654

4   (1993).

5        Petitioner filed a Motion for Reconsideration in the Arizona Supreme Court.  The motion

6   was denied without comment.

7        Petitioner then filed a Petition for Post-Conviction Relief (PCR) pursuant to Rule 32 of

8   the Arizona Rules of Criminal Procedure.   He also filed a pro se supplement to his petition.

9   Respondents moved to strike the supplement, arguing that Petitioner was represented by counsel

10  and could only file pleadings through his attorney.  The PCR court granted the motion to strike

11  and denied Petitioner's request for post-conviction relief.  (ME 6/27/96; Order dated 7/5/96).

12       Petitioner filed a Petition for Review and an Amended Petition for Review in the Arizona

13  Supreme Court.  The court denied the petition without comment.

14       Petitioner filed his Petition for Writ of Habeas Corpus in this Court on June 12, 1997.

15  (Dkt. 1.)  He filed his First Amended Petition for Writ of Habeas Corpus on March 19, 1998.

16  (Dkt. 39.)

17                      **AEDPA STANDARD FOR RELIEF**

18       Petitioner's habeas claims are governed by the applicable provisions of the Antiterrorism

19  and Effective Death Penalty Act (AEDPA).  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).

20  The AEDPA established a "substantially higher threshold for habeas relief" with the

21  "acknowledged purpose of 'reducing delays in the execution of state and federal criminal

22  sentences.'"  *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939-40 (2007) (quoting *Woodford v.

23  Garceau*, 538 U.S. 202, 206 (2003)).   The AEDPA's "'highly deferential standard for

24  evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the

25  doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh,* 521 U.S.

26  at 333 n.7).

27       Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated

28  on the merits" by the state court unless that adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The phrase "adjudicated on the merits" refers to a decision resolving a party's claim which is based on the substance of the claim rather than on a procedural or other non-substantive ground. *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S. Ct. 649, 653 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 127 S. Ct. at 654; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004). Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth

in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Landrigan*, 127 S. Ct. at 1940; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240.

As the Ninth Circuit has noted, application of the foregoing standards presents

difficulties when the state court decided the merits of a claim without providing its rationale. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law. *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167. Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision. *Pirtle*, 313 F.3d at 1167 (citing *Delgado*, 223 F.3d at 981-82). Only when a state court did not decide the merits of a properly raised claim will the claim be reviewed de novo, because in that circumstance "there is no state court decision on [the] issue to which to accord deference." *Pirtle*, 313 F.3d at 1167.

## DISCUSSION

**Claim 3:**     **Petitioner's rights were violated when the court refused to grant an ex parte hearing on his motion to obtain a defense expert.**

Petitioner alleges that the trial court's denial of his request for an ex parte hearing to obtain funds for a forensic pathologist violated his rights to due process and equal protection. (Dkt. 79 at 83-84.)

Prior to trial, defense counsel made requests for ex parte proceedings, arguing that such proceedings were necessary "to keep confidential certain steps in the preparation of his defense" and were authorized pursuant to *Ake v. Oklahoma*, 470 U.S. 68 (1985). (ROA 106; *see* ROA 205.) The trial court denied the requests, finding there was no authority allowing the court to hold ex parte proceedings. (ROA 124, 225; RT 1/12/90 at 57.) On August 3, 1990, two weeks before trial, Petitioner filed a motion seeking authorization for the appointment of an unspecified expert; he contended that "he should not be required to disclose the exact nature of the examination or other details to the prosecution at this time." (ROA 291.) The State objected on the grounds that it would be prejudiced by the late disclosure of the expert's findings. (RT 8/6/90 at 3-4.) After an ex parte consultation with the defense team's criminalist, the trial court granted Petitioner's motion to appoint an expert. (ROA 296.) On August 13, 1990, Petitioner disclosed the identity of the expert, Dr. Vincent DiMaio, a pathologist from

Texas, and his finding that the victim's wounds were produced by a single assailant. (*See* RT 8/15/90 at 117.)

On direct appeal, the Arizona Supreme Court rejected the claim that Petitioner's rights were violated by the trial court's denial of his request for ex parte proceedings:

> Rudi asked that the trial court hold an *ex parte* hearing at which he could present a request for expert assistance under A.R.S. § 13-4013 without "tipping his hand" to the prosecution. The trial court denied the request, noting that there was no authority for such a hearing. Therefore, it would violate Canon 3(A)(4) of the Code of Judicial Conduct, which forbids *ex parte* proceedings except as authorized by law. Defendant claims that this denial was error and deprived him of the opportunity to request expert assistance.
>
> In the companion case, we rejected the claim that a defendant has a constitutionally guaranteed right to present requests for expert assistance *ex parte.* Even if defendant had such a right, he could not show prejudice from the denial of it in this case. After his request for an *ex parte* hearing was denied, his request for the expert assistance of a pathologist was granted.

*Apelt (Rudi)*, 176 Ariz. at 374, 861 P.2d at 659 (citation omitted).[7]

Analysis:

In support of this claim, Petitioner relies on the Supreme Court's *Ake* decision. In *Ake*, the Court held that due process requires the state to provide an indigent defendant access to one

---

[7] In Michael Apelt's case, the Arizona Supreme Court denied a similar claim, explaining that,

> we do not believe that the Fourteenth Amendment's guarantees of due process and equal protection encompass such a right. Neither due process nor equal protection requires that the state equalize the resources of the indigent and the wealthy defendant. *Ross v. Moffitt,* 417 U.S. 600, 616 (1974). Rather, they guarantee the indigent an opportunity to present his or her claims adequately and fairly. *Id.* To put it another way, they assure the indigent defendant access to the "basic tools" of an adequate defense. *Ake v. Oklahoma,* 470 U.S. 68, 77 (1985).
>
> Arizona affords the criminal defendant the right to expert assistance at county expense upon a showing of need. Given the broad disclosure required by the Arizona Rules of Criminal Procedure, an *ex parte* hearing on the defendant's request for assistance would be potentially helpful to the indigent defendant only when the expert's analysis turns out to support a position contrary to that of the defendant.

*Apelt (Michael)*, 176 Ariz. at 365, 861 P.2d at 650.

competent psychiatrist when the defendant demonstrates that "his sanity at the time of the offense is to be a significant factor at trial." *Ake*, 470 U.S. at 83.

Petitioner's assertion that he is entitled to habeas relief based on an *Ake* violation fails on several grounds. First, the Supreme Court "has not yet extended *Ake* to non-psychiatric experts." *Conklin v. Schofield*, 366 F.3d 1191, 1206 (11th Cir. 2004); *see Caldwell v. Mississippi*, 472 U.S. 320, 323 n. 1 (1985) (Supreme Court declined to extend *Ake*'s holding to the appointment of a criminal investigator, fingerprint expert, and ballistics expert, stating "we have no need to determine as a matter of federal constitutional law what *if any* showing would have entitled a defendant to assistance of the type sought here") (emphasis added). Next, Petitioner has cited no clearly established federal law under which he was constitutionally entitled to an ex parte hearing – certainly *Ake* does not stand for that proposition. Finally, as the Arizona Supreme Court noted, even if the holding in *Ake* applied to the appointment of a forensic pathologist, Petitioner would not benefit, because the trial court ultimately did appoint the expert Petitioner requested.

The Arizona Supreme Court did not unreasonably apply clearly established federal law when it denied this claim. Therefore, Petitioner is not entitled to relief on Claim 3.

**Claims 4, 5, 6, and 9:**          **Ineffective Assistance of Counsel**

Petitioner raises several claims of ineffectiveness of counsel ("IAC") at the guilt stage of trial.[8] The PCR court summarily denied Petitioner's IAC claims as "not colorable because Petitioner failed to make a preliminary showing that counsel acted below objective standards of reasonableness or that there exists a reasonable probability that the result of the trial or sentencing proceeding would have been different." (ME 6/27/96; Order dated 7/5/96.) As set forth below, the PCR court's application of the *Strickland* standard does not entitle Petitioner to habeas relief.

Clearly established federal law:

---

[8] Petitioner's lead counsel was Victor Ortiz, who was appointed to the case on May 1, 1989, after two previous attorneys withdrew due to conflicts of interest. (ROA 83.) Robert Brown was appointed co-counsel on November 27, 1989. (ROA 163.)

1    For IAC claims, the applicable law is set forth in *Strickland v. Washington*, 466 U.S. 668

2    (1984).  To prevail under *Strickland*, a petitioner must show that counsel's representation fell

3    below an objective standard of reasonableness and that the deficiency prejudiced the defense.

4    466 U.S. at 687-88.

5    The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to

6    eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

7    challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.*

8    at 689.  Thus, to satisfy *Strickland*'s first prong, deficient performance, a defendant must

9    overcome "the presumption that, under the circumstances, the challenged action might be

10   considered sound trial strategy."  *Id.*  For example, while trial counsel has "a duty to make

11   reasonable investigations or to make a reasonable decision that makes particular investigations

12   unnecessary, . . . a particular decision not to investigate must be directly assessed for

13   reasonableness in all the circumstances, applying a heavy measure of deference to counsel's

14   judgments."  *Id.* at 691.  To determine whether the investigation was reasonable, the court

15   "must conduct an objective review of [counsel's] performance, measured for reasonableness

16   under prevailing professional norms, which includes a context-dependent consideration of the

17   challenged conduct as seen from counsel's perspective at the time."  *Wiggins v. Smith*, 539 U.S.

18   510, 523 (2003) (citation and quotation marks omitted).  As the Supreme Court recently

19   reiterated, "In judging the defense's investigation, as in applying *Strickland* generally, hindsight

20   is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions

21   are made" and by applying deference to counsel's judgments.  *Rompilla v. Beard*, 545 U.S. 374,

22   381 (2005) (quoting *Strickland*, 466 U.S. at 689).

23   Because an IAC claim must satisfy both prongs of *Strickland*, the reviewing court "need

24   not determine whether counsel's performance was deficient before examining the prejudice

25   suffered by the defendant as a result of the alleged deficiencies."  *Strickland*, 466 U.S. at 697

26   ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient

27   prejudice . . . that course should be followed").  A petitioner must affirmatively prove prejudice.

28   *Id.* at 693.  To demonstrate prejudice, he "must show that there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. In answering that question, a reviewing court necessarily considers the strength of the state's case. *See Allen v. Woodford,* 395 F.3d 979, 999 (9th Cir. 2005) ("even if counsel's conduct was arguably deficient, in light of the overwhelming evidence of guilt, [the petitioner] cannot establish prejudice"); *Johnson v. Baldwin*, 114 F.3d 835, 839-40 (9th Cir. 1997) (where state's case is weak, there is a greater likelihood that the outcome of the trial would have been different in the absence of deficient performance).

Finally, the Court notes that under the AEDPA, its review of the state court's decision is subject to another level of deference. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). In order to merit habeas relief, therefore, Petitioner must make the additional showing that the state court's ruling that counsel was not ineffective constituted an unreasonable application of *Strickland*.

Claim 4:

Petitioner alleges that his trial counsel were ineffective for calling Dr. DiMaio as a witness. (Dkt. 79 at 52-59.) Dr. DiMaio, the court-appointed defense pathologist, testified that a single attacker was responsible for the victim's wounds. (RT 8/28/90 at 47.) Unfortunately for Petitioner, whose defense was that his brother, acting alone, killed Ms. Monkman, Dr. DiMaio testified on cross-examination that the attacker was likely right-handed. (*Id.* at 76.) Petitioner is right-handed; his brother is left-handed. (*Id.* at 151.) Petitioner asserts that counsel did not adequately investigate Dr. DiMaio's findings in preparation for his testimony.

Petitioner argues, and the record suggests, that defense counsel were not prepared for Dr. DiMaio's testimony that the victim's wounds were caused by a right-handed assailant and for subsequent testimony that Petitioner was right-handed while his brother was left-handed. After this testimony, counsel's only course was to challenge the evidence that Petitioner was right-

handed and Michael left-handed.  (*Id.* at 152-54; RT 8/29/90 at 60-61.)

However, following *Strickland*'s directive, the Court need not decide whether counsel's performance with respect to Dr. DiMaio's testimony was deficient because, in this instance, it is easier to assess the prejudice prong of Petitioner's IAC claim.  *Strickland*, 466 at 697.

The Supreme Court has explained that the prejudice component of an IAC claim "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Therefore, "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."  *Id.* at 369.  The Court then explained that "[u]nreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Id.* at 372.

The fact that a leading expert in stab wounds testified regarding the nature of the victim's injuries had the opposite effect of "undermin[ing] confidence in the outcome" of Petitioner's trial.  *Strickland,* 466 U.S. at 694.  Rather, the testimony added to the reliability of the verdict by providing the jury with additional, highly relevant information about the manner of the victim's death and the identity of her assailant.  There is no doubt that the information presented regarding the handedness of the killer was detrimental to the defense and certainly compromised, if it did not eliminate, whatever benefit was gained by Dr. DiMaio's testimony in support of the single-assailant theory.  Nonetheless, as the Supreme Court cautioned in *Fretwell*, to "set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." 506 U.S. at 369-70.  Assuming that counsel performed ineffectively in presenting Dr. DiMaio's testimony, granting Petitioner habeas relief because counsel's performance allowed the jury to hear crucial evidence about the crime would constitute a windfall to which Petitioner is not entitled.

Counsel's performance with respect to the testimony of Dr. DiMaio did not undermine the reliability of the verdict or deprive Petitioner of any substantive or procedural right.

- 20 -

Therefore, under *Fretwell*, Petitioner was not prejudiced by counsel's performance. Furthermore, given the strength of the other evidence establishing Petitioner's role in the murder of Cindy Monkman, *see infra* at 24-27, there is no reasonable probability that the outcome of the trial would have been altered if counsel had handled Dr. DiMaio's testimony differently.

The ruling of the PCR court was not an unreasonable application of federal law, and Petitioner is not entitled to relief on Claim 4.

Claim 5:

Petitioner alleges that counsel performed ineffectively by failing to object to the qualifications of his interpreter.[9] (Dkt. 79 at 59-62.) Petitioner asserts that the interpreter was not qualified to interpret from German to English and, as a result, he was unable to understand the pre-trial and trial proceedings, to assist his counsel, and to confront witnesses.

Petitioner is not entitled to relief on this claim because he has made no showing that the interpreter was unqualified or that her performance was inadequate. The only specific allegation Petitioner offers is that the interpreter was not familiar with legal terminology. (*Id.* at 60.) Petitioner has not provided any support for the proposition that he was entitled to an interpreter with legal expertise. More importantly, he has not attempted to satisfy his burden under the prejudice prong of *Strickland* by demonstrating that there was a reasonable probability that the outcome of the proceedings would have been different had trial counsel objected to the interpreter's qualifications.

Claim 6:

During trial, the jury presented the following question to the trial court: "Would like to know reason for the car with a big trunk. Was victim alive when she was taken to murder scene or was she transported in the trunk?" The judge proposed that the parties allow the bailiff to

---

[9] This claim refers to Heidrun Gillespie, the interpreter appointed to translate communications between Petitioner and counsel. (Dkt. 97 at 23-24.) Petitioner does not challenge the qualifications of the official court interpreter, Karin Isbell, who translated all pretrial and trial proceedings. (*Id.*)

tell the jury that "it is a fact question, and [the jury] will have to determine the facts from the evidence and we can't answer it." (RT 8/23/90 at 3.)  Defense counsel did not object to the court's proposal.  (*Id.*) Petitioner claims counsel performed ineffectively by allowing the bailiff to engage in an unrecorded conversation with the jury about a material issue in the case.  (Dkt. 79 at 63-65.)  Again, Petitioner has offered nothing in the way of fact or argument that would allow a finding that counsel's performance here was deficient and that the outcome of the trial might have been different had counsel handled the situation differently.  Therefore, Petitioner is not entitled to relief on this claim.

Claim 9:

In his amended petition, Petitioner alleged that the State violated his right to consular access under the Vienna Convention on Consular Relations ("Convention") and that counsel performed ineffectively by failing to litigate the issue at trial and on appeal.[10]  (Dkts. 39 at 30-31.)  Petitioner raised this claim in his PCR petition.  (PCR petition at 9.)  In his merits memorandum in this Court, however, Petitioner sets out a new IAC argument, alleging that counsel performed ineffectively by failing to advise Petitioner of his rights under the Convention, thus depriving Petitioner of consular assistance in the form of legal advice and other resources.[11]  (Dkt. 79 at 65.)  In whatever iteration the claim is presented, it is without merit.

The Supreme Court has treated the issue of whether the Convention creates judicially enforceable rights as an open question, *see Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669, 2677-

---

[10]   Article 36(1)(b) of the Convention provides, inter alia, that when "a national of [another nation] is arrested or committed to prison or to custody pending trial or is detained in any other manner[,]" the United States upon request "shall, without delay, inform the consular post of [that nation]."  Vienna Convention on Consular Relations, April 24, 1963, [1970] 21 U.S.T. 77, T.I.A.S. No. 6820.

[11]   A third variation on this claim suggests that trial counsel was ineffective for failing to request assistance from the German Consulate.  (Dkt. 79 at 77.)  This claim was raised neither in state court nor in the amended habeas petition.  It is clearly unexhausted but procedurally defaulted because Petitioner is precluded under Arizona's rules from raising this claim now.  Ariz. R. Crim. P. 32.2(b).

79 (2006); *Breard v. Greene,* 523 U.S. 371, 376 (1998), and the Ninth Circuit has likewise declined to "decide whether the treaty creates individual rights that are judicially enforceable." *United States v. Lombera-Camorlinga,* 206 F.3d 882, 884 (9th Cir. 2000) (en banc).  In *Breard*, the Supreme Court held that the habeas petitioner could not show prejudice where he decided not to plead guilty and to testify on his own behalf against advice of counsel "who were likely to be far better able to explain the United States legal system to him than any consular official would have been."  523 U.S. at 377.  The Court further indicated that "it is extremely doubtful that . . . violation [of the Convention] should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial."  *Id.*; *see Sanchez-Llamas*, 126 S. Ct. at 2677-79 (even assuming the Convention created enforceable individual rights, suppression of evidence through the exclusionary rule was not an appropriate remedy for failure of arresting authorities to notify consular office of alien's arrest); *Mendez v. Roe,* 88 Fed.Appx. 165, 167 (9th Cir. 2004) ("Because no clearly established federal law directs that Article 36's consular access provision institutes a judicially enforceable right, relief for a violation of the article may not be granted in a federal habeas corpus petition.").

Given the absence of support for the proposition that the Vienna Convention creates judicially enforceable individual rights, Petitioner cannot show that trial counsel's failure to litigate the issue of a Convention violation was the result of deficient performance or the cause of prejudice.  *See, e.g.*, *Guzman v. Greene*, 425 F.Supp.2d 298, 319-20 (E.D.N.Y. 2006) (rejecting both prongs of IAC claim based on counsel's failure to litigate the government's failure to abide by the Convention).

With respect to the variation of this claim focused on in Petitioner's merits brief – i.e., that trial counsel failed to advise him of his right to consular assistance – the record indicates, inter alia, that Petitioner contacted the German Consulate General on February 3, 1989; that the Consulate General had telephonic contact with Petitioner's attorneys on March 3 and May 5, 1989; and that a member of the Consulate General met with Petitioner in person "for the first time" on May 11, 1989.  (Dkt. 78, Ex. 21.)  Based upon these circumstances, there is no support for Petitioner's assertion that defense counsel performed ineffectively by failing to inform

Petitioner of his rights under the Vienna Convention. Clearly, Petitioner was aware of those rights as early as February 1989 – and in fact had access to the consulate – more than eighteen months before his trial began. Therefore, counsel's alleged failure to inform Petitioner of his rights had no bearing on the German Consulate General's ability or willingness to provide resources for Petitioner's defense. Because Petitioner has not shown that he was prejudiced by counsel's performance, he is not entitled to relief on Claim 9.

Conclusion:

The PCR court did not unreasonably apply clearly established federal law when it determined that Petitioner's guilt-stage IAC claims did not satisfy the *Strickland* standard.

**Claim 7:** **Because there was insufficient evidence to support Petitioner's conviction for first-degree murder, the conviction and sentence violated the Fourteenth Amendment to the United States Constitution.**

Petitioner alleges that his murder conviction and sentence cannot be sustained because they are based on insufficient evidence. (Dkt. 79 at 84-89.) Principally, Petitioner challenges the credibility of Dorn's account of his role in the conspiracy and the murder.

On direct appeal, the Arizona Supreme Court rejected this argument, holding that the trial evidence supported the elements of first-degree murder:

> The evidence introduced at Rudi's trial was sufficient to prove that Michael pressured Cindy into buying life insurance in November so he could kill her and collect the proceeds. In early December, when Michael believed the $400,000 policy was in effect, Rudi and Anke reserved a rental car with a large trunk, far more suitable for transporting a body or a bound person than Cindy's small Volkswagen was. The reservation was cancelled after Michael found out that the insurance company would not issue the large policy. Therefore, the jury could have found that the agreement to kill Cindy was formed between Michael and Rudi in early December. Indeed, Michael's marriage proposal to a woman just a few days after meeting her, and Rudi's attempt to get Annette to secretly marry him, suggest that a plan to marry, insure, and murder someone was formed much earlier.

> Michael discussed the murder with Rudi several hours before it took place, at which time Rudi agreed to participate in it. Rudi and Anke then waited in the rental car and followed Michael when he drove past. Rudi took the lead and turned off the road before Michael, demonstrating a prearranged site. This evidence was clearly sufficient to demonstrate Rudi's intent and premeditation.

> Even if we assume that Michael actually stabbed Cindy, the evidence was sufficient to allow the jury to find that Rudi agreed to help Michael commit the offense and that he followed Michael to the desert in an attempt to participate in the killing. The evidence was sufficient to allow the jury to conclude that Rudi

"agreed to aid or attempted to aid" Michael in the murder and thus find him guilty as an accomplice. A.R.S. § 13-301(2); *see also* A.R.S. § 13-303. The jury was properly instructed on accomplice liability.

*Apelt (Rudi)*, 176 Ariz. at 373-74, 861 P.2d at 658-69.

Analysis:

A habeas petitioner asserting a claim of insufficient evidence "faces a considerable hurdle." *Davis v. Woodford*, 384 F.3d 628, 639 (9th Cir. 2004). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In making such a determination, a reviewing court is guided by a number of principles which reflect the doctrine that "deference [is] owed to the trier of fact." *Wright v. West*, 505 U.S. 277, 296 (1992). For example, "a federal habeas court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. In addition, it is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995). As the Ninth Circuit has explained, "The question is not whether we are personally convinced beyond a reasonable doubt. It is whether rational jurors could reach the conclusion that these jurors reached." *Roehler v. Borg*, 945 F.2d 303, 306 (9th Cir. 1991) (citing *Jackson*, 443 U.S. at 326).

Moreover, while "mere suspicion or speculation cannot be the basis for creation of logical inferences . . . [c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir. 1986); *see United States v. Johnson*, 804 F.2d 1078, 1083 (9th Cir. 1986) (the government is entitled to all reasonable inferences that may be drawn from the evidence). Thus, "the government's evidence need not exclude every reasonable hypothesis consistent with innocence." *United States v. Talbert*, 710 F.2d 528, 530 (9th Cir. 1983) (per curiam); *see United States v. Mares*,

1   940 F.2d 455, 458 (9th Cir. 1991) ("The relevant inquiry is not whether the evidence excludes

2   every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict"); *see*

3   *also Wright*, 505 U.S. at 296-97; *Jackson*, 443 U.S. at 326.

4     Petitioner focuses on Dorn's credibility as the basis for his challenge to the sufficiency

5   of the evidence.  This Court, however, must "defer to the jury's assessment" of the witnesses'

6   credibility. *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996); *see Green v. Johnson*, 160 F.3d

7   1029, 1047 (5th Cir. 1998) ("Although in some respects the evidence pointing to Green's guilt

8   is either circumstantial or based on the credibility of various witnesses, this alone is insufficient

9   to supplant the jury's determination."); *see also Walker v. Engle*, 703 F.2d 959, 969 (6th Cir.

10  1983) ("credibility is not a matter of review for a federal habeas court").  Furthermore, much

11  of Dorn's testimony was corroborated by additional evidence. The testimony of other witnesses

12  confirmed that Dorn accurately reported on the group's activities and travels, including, for

13  example, the purchase of the crossbow, the journey to the river bottom on the night after the

14  murder, and the trip to Los Angeles.  Dorn also correctly identified the location of the murder.

15    As the Arizona Supreme Court noted, the evidence at trial, including Dorn's testimony,

16  supported each element of the first-degree murder charge, including the element of

17  premeditation. *Apelt (Rudi)*, 176 Ariz. at 373-74, 861 P.2d at 658-59.  The Arizona Supreme

18  Court's rejection of Petitioner's insufficient-evidence claim was neither contrary to nor an

19  unreasonable application of clearly established federal law.  Therefore, Petitioner is not entitled

20  to relief on Claim 7.

21  **Claim 8:**   **The trial court's failure to instruct the jury on second-degree murder**

22       **violated Petitioner's rights under the Eighth and Fourteenth Amendments**
     **to the United States Constitution.**

23    Petitioner alleges that his constitutional rights were violated by the trial court's refusal

24  to provide an  instruction on the lesser-included offense of second-degree murder.  (Dkt. 79 at

25  90-96.)   He further contends that there was evidence in the record to support such an

26  instruction.

27    At trial, defense counsel requested that the court provide a jury instruction for second-

28

- 26 -

degree murder as a lesser-included offense of first-degree murder.  (ROA 339.)  The court refused to provide the instruction, commenting that under counsel's theory, which posited that Petitioner was unaware of Michael's plans to kill the victim, Petitioner "may not be guilty of anything." (RT 8/29/90 at 4-5.)  The court provided instructions on first-degree premeditated murder and conspiracy.  (*Id.* at 80-83.)  The court also instructed the jury on accomplice liability, explaining that "[a] person is criminally accountable for the conduct of another if the person is an accomplice of such other person in the commission of an offense." (*Id.* at 80.)

The Arizona Supreme Court rejected this claim on the grounds that a second-degree murder instruction was inappropriate in the absence of evidence supporting it. *Apelt (Rudi)*, 176 Ariz. at 372, 861 P.2d at 657.

Analysis:

*Beck v. Alabama*, 447 U.S. 625, 627 (1980), holds that in a capital murder trial, failure to give an instruction on a lesser-included non-capital offense which is supported by the evidence violates the defendant's due process rights by placing the jury in the position of either acquitting the defendant or finding him guilty of a capital crime.  "[T]he goal of the *Beck* rule is . . . to eliminate the distortion of the fact-finding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence." *Villafuerte v. Stewart*, 111 F.3d 616, 623 (9th Cir. 1997) (quoting *Spaziano v. Florida*, 468 U.S. 447, 455 (1984)).  *Beck* is satisfied so long as the jury had the option of at least one lesser-included offense, even if there are other lesser-included offenses also supported by the evidence. *See Schad v. Arizona,* 501 U.S. 624, 645-46 (1991).

Here, the concerns of *Beck* and *Schad* were addressed despite the trial court's denial of Petitioner's request for a second-degree murder instruction.  In addition to premeditated first-degree murder, Petitioner was charged with the non-capital offense of conspiracy to commit first-degree murder.  Therefore, the jury did not face the all or nothing choice of convicting Petitioner of a capital offense or "set[ting] the defendant free with no punishment at all." *Schad*, 501 U.S. at 646.

Moreover, under *Beck*, due process requires that a lesser-included-offense instruction be given only when the evidence warrants the instruction.  447 U.S. at 636; *see Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Carriger v. Lewis*, 971 F.2d 329, 336 (9th Cir. 1992).  Here, the evidence did not warrant a second-degree murder instruction because no evidence was presented at trial that would have allowed a jury rationally to convict Petitioner of second-degree murder while acquitting him of first-degree murder.[12]  At trial, Petitioner's defense was that his brother committed the murder without Petitioner's knowledge or participation.  If the jury had accepted this scenario, it could not have convicted Petitioner of second-degree murder, which would have required a finding that Petitioner knowingly or intentionally, but without premeditation, caused the victim's death.  *See State v. Jackson*, 186 Ariz. 20, 27, 918 P.2d 1038, 1045 (1996) (second-degree murder instruction not appropriate where defendant claimed he was not responsible for the victim's death, not that he killed the victim but lacked premeditation).  Given the facts of the case – with the victim being driven at night to a remote spot in the desert where, in the presence of both brothers, she was stabbed several times and her throat was slit – together with the principles of accomplice liability, a rational jury could not have found that Petitioner murdered the victim but did so without premeditation.

Therefore, the Arizona Supreme Court's decision upholding the trial court's refusal to provide a second-degree murder instruction was neither contrary to nor an unreasonable application of Supreme Court law.  Petitioner is not entitled to relief on Claim 8.

## CERTIFICATE OF APPEALABILITY

---

[12]  Pursuant to A.R.S. § 13-1105(A)(1), "A person commits first-degree murder if: Intending or knowing that the person's conduct will cause death, the person causes the death of another person . . . with premeditation."  Only the element of premeditation distinguishes first-degree murder from the lesser-included offense of second-degree murder.  *Clabourne*, 64 F.3d at 1380.  A defendant kills with premeditation if he "acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection.  An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion."  A.R.S. § 13-1101(1).

Although this is not a final order in these proceedings, the Court has endeavored to determine, if judgment is ultimately entered against Petitioner, whether a certificate of appealability (COA) should be granted on the issues addressed herein. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right, and (2) whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could not debate its analysis of Petitioner's properly-exhausted, conviction-related claims. The Court further finds, for the reasons set out in the Court's order of April 11, 2000, that reasonable jurists could not debate the Court's dismissal of the remainder of Petitioner's conviction-related claims as procedurally barred, meritless, or non-cognizable. (Dkt. 71.) Accordingly, the Court does not intend to issue a COA on any of these issues in the event judgment is ultimately entered against Petitioner. Petitioner may seek reconsideration of this determination within any motion for reconsideration from this Order.

## CONCLUSION

The Court, having considered Claims 3, 4, 5, 6, 7, 8, and 9 on the merits, finds that Petitioner is not entitled to federal habeas relief on these conviction-related claims. The Court further finds, with respect to these claims, that an evidentiary hearing is neither warranted nor required.

Accordingly,

**IT IS HEREBY ORDERED** that Claims 3, 4, 5, 6, 7, 8, and 9 of Petitioner's Amended Petition for Writ of Habeas Corpus are **DENIED WITH PREJUDICE**. (Dkt. 39.)

**IT IS FURTHER ORDERED** that if, pursuant to LRCiv. 7.2(g), Petitioner or Respondents file a Motion for Reconsideration of this Order, such motion shall be filed within fifteen (15) days of the filing of this Order.

**IT IS FURTHER ORDERED** that Petitioner's sentencing-related claims remained stayed pending further order of this Court.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this decision to all counsel of record and to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

DATED this 8th day of August, 2007.

Roslyn O. Silver
United States District Judge